Good morning, and may it please the Court, Counsel, I'm Zach Allen. I'm here on behalf of Appellant Dr. Warren Roberts and his professional corporation. I'd like to start with two sort of introductory overarching points, and the first is that this is not an apparent authority case. That is, there was no effort in the district court's ruling to sustain its conclusion on the basis of apparent authority. That is, that Dr. Roberts did anything to manifest to defendants that his attorney had authority to settle the case. And the second is to clear up any confusion about the exercise here on appeal, the standard of review. We are not challenging any of the district court's findings of fact. What we are challenging is its conclusion of law, and that conclusion of law is at paragraph 11, page 23 of the findings of fact and conclusion of law. Specifically, that the words from Dr. Roberts in the text message on the morning of October 20th, please do not dismiss case. And the district court, I think reading that opinion, concluded that that was not sufficient to revoke McDougall's authority to settle the case on Dr. Roberts' behalf. And if you read that opinion from the district court, it concludes that that authority persisted and was not revoked until a later meeting on November 14th, when the district court concluded that was the first time that Dr. Roberts expressed that he had changed his mind, that he did not want to settle the case. At a somewhat higher level of analysis, isn't the case about whether the defendant's responses to McDougall accepting the settlement offer were effective? I mean, isn't that, at that moment, maybe effective is the wrong word, but the question is, at that moment, did the parties reach a settlement? You and I might get to that moment in different ways. You might say, well, there wasn't, you know, McDougall's authority to offer a settlement had been withdrawn. How can that be? But I want to rest on that moment for just one second. And here's my question. You said this is not an apparent authority case. Hadn't McDougall represented himself as your client's agent throughout the litigation? Everyone at that point in the case, all the other lawyers, knew that they could rely on Mr. McDougall. In fact, they would be breaching their ethical duties if they were to try to contact your client directly, right? I'd certainly concede the last point, yes, Your Honor. But Oregon law is very clear on this point and has been consistent for a long time. Simply because of the attorney-client relationship, that is not enough to convey to the opposing side that the attorney has settlement authority. And that's been clear since Galbraith in 1938 as a matter of Oregon law. Simply because you are the attorney does not mean that the other side is entitled to rely on the notion that the attorney has settlement authority. In fact, they've said that you have a duty to inquire in dealing with your counterpart as an attorney about the extent of that authority. And is that true prior to any transaction that a lawyer might engage in in a case, that prior to engaging in any transaction, the lawyer has to go to the other side's lawyer and say, do you really have authority to make this deal? I'm not sure I'd go that far, Your Honor, but it's certainly the case with settlement. Settlements regarded in Oregon law is something sort of sacrosanct. It's a momentous undertaking. And at least to go that far, you have to ascertain your counterpart's ability to settle the case. Let's put that to one side for a moment and the question of whether they had to check or not. Can we agree that on this record there's no evidence that the defendant saw any diminution in McDougall's authority? They had no reason to they were not aware of any facts that would cause them to think that whatever authority McDougall had had before, he no longer had that authority. That's true, Your Honor, but I would say they never inquired in the first place. They didn't know if the offers had been extended with authority. As I think we point out in the brief, it's as if authority was granted or denied behind closed doors for them. And then when we go through this settlement hearing and process, they find out, oh, yes, there was authority to begin with, but it was revoked. And that's the point we make in the reply brief, that there's simply no prejudice. There's no worse off than if McDougall didn't have authority in the first place to extend the offers. Let me read to you the paragraph 28, which contains the message sent by Dr. Roberts. And it doesn't merely say please don't dismiss until we've had a chance to discuss. Dr. Roberts writes, I have now had a bit more time to consider case options. I would like to speak to you about case abatement. Let me know a good time it works for you. Please do not dismiss a case until we've had a chance to discuss this. What's he mean by abatement? I think at the time, Dr. Roberts, the evidence was that on October 16th, the prior week, they had discussed various options about proceeding forward, and abatement was one of those. And how is abatement different from settlement? Well, it is. I struggle to understand how please do not dismiss the case. And the exercise below in distinguishing this was to say dismissal. What he actually meant by that was don't enter the judgment of dismissal. Don't actually submit that document. But you can bind me to do that. It's our contention that that's just not a reasonable construction of that text message. I mean, this is a non-lawyer speaking to a lawyer, and I think the suggestion below at least was, well, he had to say don't enter me into a binding settlement as opposed to please don't dismiss case. And it's our position that just as a reasonable construction, manifestation by the principal to the agent, that's not a reasonable construction of that. I mean, please do not dismiss case means please do not dismiss case. Do not bind me to that course of action. And that's our contention on that point of law, and that the district court just erred in concluding that he had authority to bind his client to a settlement of dismissal, but not to actually dismiss the case. Didn't the — there was a moment in time when McDougal did have this authority, correct? Correct. And this issue was litigated below, but that's no longer an issue on appeal. As a matter — yes. So he did have that authority. So isn't this case different from Galbraith? Because in Galbraith, the lawyer in question never had the authority, and I thought that was the basis on which the court made its decision. I think that's correct. I think you're dealing with a very unusual fact pattern, and this has not arisen in Oregon law, what happens in these circumstances. Galbraith, I concede, would not be directly controlling, but it certainly has the principle you are on — as an opposing party, you have a duty to inquire. The point that Galbraith doesn't address, though, and I don't think any of these cases, though, is where is the — where is the evidence in the record below that there was a valid acceptance from each of these defendants, and to be a valid acceptance to an agent, the Kincaid case says you have to communicate that to someone who is validly authorized. And it — But this gets back to our earlier discussion. If they think he's authorized under the restatement of agency, and they have good reason for thinking that the acceptance is effective, and your client's cause of action is against McDougal. Well, again, Your Honor, I think that's injecting the concept of apparent authority, and Oregon law is clear. They weren't entitled to assume that he had that authority. He either did or did not. And as it turns out in the event, he did not. And so at the time the acceptance is conveyed, an acceptance conveyed to an unauthorized agent is no more effective than one conveyed to a stranger on the street or the lamppost over here. I mean, it was an unauthorized agent at that point. It's a clear matter of this record. And so unless there's further questions, I'd reserve the balance of my time for rebuttal with the Court's permission. You got it. Sure. Good morning. My name is Keith Dubanovich. May it please the Court, counsel. I will speak on behalf of all appellees and defendants. Let me start at the end, and I'll go back to the beginning eventually. And your question asked about the authority to receive an acceptance. The Supreme Court of Oregon said in the Wiggins v. Barrett case that the express authority to do a certain thing carries with it the implied authority to do those things that are reasonably necessary to carry out the authorized task. Here, what we have is an attorney who has express authority to make a settlement offer. He, therefore, has the implied authority to receive acceptances. Mr. McDougall had no discretion to reject those acceptances. He was authorized to make an offer. So it was a ministerial act. Once he received the acceptances, he had the implied authority to receive those acceptances.  And he was in compliance with the contract at that point in time. And do you mean that he had the implied authority vis-à-vis his own client or simply vis-à-vis your client? The implied authority comes from the express authority that Dr. Roberts granted in Mr. McDougall. And, therefore, when he extended that offer, it was implied to those people that received the offer that he had the authority to receive an acceptance. So let me go back to the beginning. It is our position first that this issue was actually not properly preserved or presented to the district court. Yes, it was discussed at the very beginning of the hearing, but it was abandoned. It was abandoned for a good reason. There was simply no factual support for the revocation argument in the hearing. So even if it has been preserved, as I said, there's simply no factual evidence that supports the hypothesis that the October 20 email is a revocation. You've got the record in front of you, and I brought an enlargement. If you read those words very carefully, it's quite clear that what was going on is Dr. Roberts had agreed to settle the case, but he wanted to have some additional time to discuss abatement. And what is the abatement about? Dr. Roberts had a prior law firm, the Markowitz-Herbold Law Firm. He had a lien from that firm. They had a very sizable lien in the hundreds of thousands of dollars. Dr. Roberts was very concerned that as soon as a judgment was entered, that lien would become due and owing. And he wanted to figure out how to get out from underneath the lien. He had that discussion with Mr. McDougall before he authorized the settlement and wanted additional time to negotiate with the Markowitz firm. That's what abatement was about. At no time in that communication did Dr. Roberts ever communicate to withdraw the offer or withdraw the authority. Those are similar, but they're different. And in neither circumstance did he do either. Could you explain to me a little bit about that lien? How did that come about? The Markowitz-Herbold firm was working for Dr. Roberts on an hourly basis. Apparently, he became in arrears. When they resigned from the case, they had a lien on the case. So it followed the case. When another firm took over, Mr. McDougall, the lien attached to the case and any proceeds of the case. But there were going to be no proceeds. True, but it doesn't mean the lien wasn't due and owing. Well, the money might have been due and owing, but the lien wasn't any good as lien. Good luck collecting, Your Honor. You're right, Your Honor. But the lien was So he was concerned about the indebtedness to the earlier firm. That's correct. Whether by lien or otherwise. That's correct, Your Honor. And how would some delay have allowed him to escape or diminish that liability? I don't know. It's not in the record, but certainly he could have negotiated with the Markowitz firm. He could have talked to them and said, Look, I'm not getting any money out of this case. Would you release your lien? Would you release it for 10 cents on the dollar? What he wanted was some time to work out the lien. The record doesn't say how he was going to work it out, Your Honor. Yes. If you could just follow up on Judge Fletcher's question to your opponent about what abatement is in state court litigation here. So you can settle a case and abate the case. They are not inconsistent. Indeed, Mr. McDougall said from his perspective they were consistent. That's why he had a further conversation with Dr. Roberts, and it wasn't until November that he recognized that Dr. Roberts had changed his mind. Abatement simply was going to put the case on hold. No discovery would take place. The parties wouldn't litigate. He was just simply getting an opportunity to go to the Markowitz-Herbold firm and negotiate the lien. That's all abatement was. So abatement in Oregon language is hold the phone? Yes. Put a hold on the case. Don't do anything. Yeah. Yeah. So if we take a look at the record, what we know is that there's the e-mail itself doesn't mention anything about revocation. But that's not all that Judge Simon had in front of him. He had the testimony of the witnesses. And it's a factual finding about whether or not that October 20 e-mail is a revocation, and that is reviewed for clear error. And because it is an issue that is wrapped around credibility determinations, the U.S. Supreme Court said in the Anderson v. City of Bessemer case that that demands even greater deference to the trial court's ruling. Mightn't it be, because of these questions of agency, also a factual question as to whether Judge Simon found that Mr. McDougall didn't interpret it as a revocation? I mean, is Mr. McDougall's intent at issue on this appeal? I don't think it's Mr. McDougall's intent. I mean, understanding is the word I should have used. Absolutely. And his testimony was pretty clear that at no time did he perceive that his authority had been revoked. Indeed, at no time. Although his response doesn't quite mesh with that, because he's basically trying to persuade Dr. Roberts out of backing out of it, saying, for example, if we back out, my credibility is at issue. He clearly regarded that e-mail as Dr. Roberts having second thoughts, at a minimum. Only in respect to the abatement issue, because they'd already discussed abatement. And Dr. Roberts is now saying, geez, I want abatement. And Mr. McDougall is saying, we've already talked about abatement. Why do you want to go back and undo the deal? Does he have concerns that Dr. Roberts is backing out? Possibly. But at no time did Dr. Roberts ever instruct him to withdraw the offers. Mr. McDougall clearly testified that he didn't perceive that he had been instructed to withdraw the offers. And there's certainly no evidence that Mr. McDougall felt that e-mail was a revocation of his authority. But the more important thing, frankly, is to recognize that as Dr. Roberts testified, and this is on S.E.R. 33, it's pretty clear. His lawyer asked him, why didn't you say your settlement authorities are by revoke? And Dr. Roberts said, he never had settlement authority, so I never would have thought to say that. That's Dr. Roberts' testimony. So the record is real clear that that October 20 e-mail is not a revocation. But even if it is, as Your Honor started to talk about, that revocation of the offer has to be communicated to the offeree for it to be effective. You can't just rely upon someone's subjective second thoughts. The settlement offer had to be withdrawn, and that communication had to go directly to the offerees. As we stated on page 13 of our brief, termination by revocation occurs only when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract. So if I offer you my car, until I do something that says, oh, I'm taking the offer back, you have the power to accept. I have in control the ability to terminate the offer. Until I communicate that to you, it is a ripe offer that you can accept. And in this case and on this record, there is no communication of the revocation of the offer or of Mr. McDougall's authority, which is clearly implied. The defendants all accepted before November 14. And therefore, there was no revocation of the offer. The offer remained ripe and was accepted. It was a full contract at that point. So in conclusion, it's our belief that the record does not show that the issue has properly been preserved. Second, the facts simply do not support revocation at all. And even if there had been a revocation, because it was never communicated to the defendants, it is not an effective revocation. The offer was accepted, and therefore, the judgment should be affirmed. Thank you, Your Honor. Roberts. And you've saved just about two minutes. Wonderful. I heard no answer to the legal point there in that argument that to be effective, an acceptance must be communicated to a validly authorized agent. I'm not contending that the offer was somehow revoked when Dr. Roberts communicated with his attorney vis-à-vis the defendants. What we are saying is there had to be a valid communication of acceptance, and there's been no answer to that legal point. And there's no evidence that it was. Acceptance by whom? I'm sorry? You said no valid communication of an acceptance. Acceptance by whom? Acceptance by all of the defendants, because it was a mutual walkaway, right? The settlement was predicated on everybody accepting. So when was the last acceptance by the last defendant? Last acceptance? The evidence was somewhat unclear on when one of them accepted, but the evidence is very clear that at least one of them accepted after Mr. McDougall had received the text message from Dr. Roberts on October 20th. The text message that said? Please do not dismiss. Right. So the real question, and this is what we've been circling around or focusing on, is what was the import of that text message about abatement and don't dismiss? Quite so. And it's our contention as a legal matter, there can be no other construction. Please do not dismiss case does not mean you can bind me to a settlement of dismissal so long as we abate it long enough, right? You can dismiss it as we go down the road at some later time. Please do not dismiss case means please do not dismiss case. And if you look at Mr. McDougall's response to that, he clearly understood what it meant. He said we shouldn't mess with it. We've made this offer. Well, what he says is, this is McDougall coming back to Dr. Roberts, he says, listen, if we abate it and don't dismiss now, we run the risk of being stuck with various attorney's fees and costs in the interim between now and the ultimate dismissal. That's the one of his concerns. And he also says, I'm going to lose my credibility, but I'm not sure lose credibility because there's no good offer and acceptance of the settlement. It might be a more subtle thing of, listen, in the ordinary course of events, once we do this, we just get entered into a settlement. But the text of the email that goes back to Dr. Roberts talks about the possibility and worries about the possibility of costs and fees building up during the period of abatement, which, of course, is not a surprise. Fair enough. I caution the court against relying too much on that response. I mean, our contention is please do not dismiss case. There's no other reasonable interpretation when the question is, actual authority hinges on what was manifested from principal to agent. Please do not dismiss case means please do not dismiss case. Got it. Thank you. Thank both sides for helpful arguments. Warren Roberts versus Pacific Spine Specialist et al. now submitted for decision.
judges: Fernandez, W. Fletcher, Tigar